**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE: MAXIM INTEGRATED | ) | Master Docket: Misc. No. 12-244 |
| PRODUCTS, INC. MDL No. 2354 | ) | |
| | ) | This Document Relates to: Civil No. 12-945 |
| | ) | |

**MEMORANDUM OPINION**

**Conti, Chief U.S. District Judge**

       This multidistrict patent infringement litigation (the "MDL") was, at one time,

comprised of more than 25 cases in which Maxim Integrated Products, Inc. ("Maxim") accused

various entities, referred to collectively as the Opposing Parties, of infringing several of its

patents.  The only case that remains pending is between Branch Banking and Trust Company

("BB&T") and Maxim.  On July 30, 2015, the court held a hearing on objections to expert

witnesses proffered by both BB&T and Maxim. (ECF Nos. 1013, 1014, 1016.)[1]  This written

opinion memorializes the rulings made by the court on the record during that hearing, and rules

on those objections taken under advisement at that time.

### I. Factual Background

       When this patent infringement dispute between BB&T and Maxim was

transferred to this court, in July 2012, Maxim accused BB&T of infringing four of its patents by

providing a mobile banking application for its customers to use on devices such as smartphones

and tablets (the "BB&T app").  The four patents asserted by Maxim were United States Patent

Numbers 5,940,510 (the "'510 Patent"), 5,949,880 (the "'880 Patent"), 6,105,013 (the "'013

---

[1] All citations refer to the docket of the 12-mc-244 action, unless otherwise noted.  The transcript of the July 30, 2015 <u>Daubert</u> hearing has been filed, under seal, on the docket at ECF No. 1050, pending the parties' redaction requests.  The court will cite to the transcript as "Trans. ___."

Patent"), and 6,237,095 (the "'095 Patent"). In September 2014, Maxim voluntarily dismissed its infringement claims based upon the '880 Patent. (ECF Nos. 909 and 937.)

This court issued its rulings on claim construction in a written opinion dated December 17, 2013. (ECF No. 742.) On April 17, 2015, the court entered an order denying BB&T's motion for suggestion of remand to the Panel on Multidistrict Litigation and scheduled <u>Daubert</u> proceedings. (ECF Nos. 1002-1003.) BB&T filed motions challenging the opinions of two expert witnesses proffered by Maxim. (ECF Nos. 1013-14.) Maxim filed one motion that challenged the opinion of an expert witness proffered by BB&T. (ECF No. 1016.)

## II. <u>Legal Standards</u>

Federal Rule of Evidence 702 governs the admissibility of expert testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED.R.EVID. 702. Under the seminal case of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), district courts must act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is ... reliable." <u>Id.</u> at 589. While <u>Daubert</u> applied exclusively to scientific testimony, <u>see</u> <u>Daubert</u>, 509 U.S. at 590 n.8, the Supreme Court subsequently extended the district court's gatekeeper function to all expert testimony. <u>Kuhmo Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999).

Whether proffered expert testimony should be admitted in a trial is a procedural issue not unique to patent law, and therefore the law of the regional circuit applies. <u>Global Traffic Technologies LLC v. Morgan</u>, No. 2014-1537, 2015 WL 3513416, at *9 (Fed. Cir. June 4, 2015); <u>Davis v. Brouse McDowell, L.P.A.</u>, 596 F.3d 1355 (Fed. Cir. 2010); <u>Micro Chem., Inc. v. Lextron, Inc.</u>, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). The United States Court of Appeals for the Third Circuit explained that Rule 702 "embodies a trilogy of restrictions" that expert testimony must meet for admissibility: qualification, reliability, and fit. <u>Schneider ex rel. Estate of Schneider v. Fried</u>, 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert testimony has the burden of establishing each of these requirements by a preponderance of the evidence. <u>In re TMI Litig.</u>, 193 F.3d 613, 663 (3d Cir. 1999).

**A. <u>Qualification</u>**

An expert witness's qualification stems from his or her "knowledge, skill, experience, training, or education." FED.R.EVID. 702. The witness therefore must have "specialized expertise." <u>Schneider</u>, 320 F.3d at 405. The court of appeals interprets the qualification requirement "'liberally,' holding that 'a broad range of knowledge, skills, and training qualify an expert as such.'" <u>Calhoun v. Yamaha Motor Corp., U.S.A.</u>, 350 F.3d 316, 321 (3d Cir. 2003) (quoting <u>In re Paoli R.R. Yard PCB Litig. (Paoli II)</u>, 35 F.3d 717, 741 (3d Cir. 1994)).

**B. <u>Reliability</u>**

In <u>Daubert</u>, the Supreme Court stated that the district court's gatekeeper role requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is ... valid and of whether the reasoning or methodology properly can be applied to the facts in issue." <u>Daubert</u>, 509 U.S. at 592–93. While the Court noted in <u>Daubert</u> that district

courts were permitted to undertake a flexible inquiry into the admissibility of expert testimony under Rule 702, the Court of Appeals for the Third Circuit has enumerated the following eight factors that a district court may examine:

1. whether a method consists of a testable hypothesis;

2. whether the method has been subjected to peer review;

3. the known or potential rate of error;

4. the existence and maintenance of standards controlling the technique's operation;

5. whether the method is generally accepted;

6. the relationship of the technique to methods which have been established to be reliable;

7. the qualifications of the expert witness testifying based on the methodology; and

8. the non-judicial uses to which the method has been put.

Paoli II, 35 F.3d at 742 n.8. This list of factors is a "convenient starting point," but is "neither exhaustive nor applicable in every case." Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806–07 (3d Cir. 1997).

Under these factors, experts are not permitted to engage in a "haphazard, intuitive inquiry," but must explain the research and methodology they employed in sufficient detail in order to allow the other party's expert to test that hypothesis. Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000). Where an expert fails to use standards to control his or her analysis, "no 'gatekeeper' can assess the relationship of [the expert's] method to other methods known to be reliable and the non-judicial uses to which it has been put." Id. at 158.

"The evidentiary requirement of reliability is lower than the merits standard of correctness." Paoli II, 35 F.3d at 744. "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process - competing expert testimony and active cross-examination - rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." United States v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004) (quoting Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)).

**C. Fit**

The Rule 702 requirement that testimony "will help the trier of fact to understand the evidence or to determine a fact in issue" is called the "fit" requirement. Fit requires that there be a "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." Paoli II, 35 F.3d at 743. "'Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'" Id. (quoting Daubert, 509 U.S. at 591). The standard for fit is "not that high," although it is "higher than bare relevance." Id. at 745.

**III. Discussion**

**A. Challenges to the Expert Opinion of Donald Alpert, PhD**

Maxim proffered Donald Alpert, PhD ("Alpert") as an expert witness on the issue of infringement. Alpert opines that all mobile devices sold after December 2011 that use an iOS or Android operating system and on which BB&T's app is installed infringe the asserted claims of the '013, '095, and '510 Patents. (ECF No. 1018 at 6.) BB&T challenged Alpert's opinion on two grounds: (1) Alpert does not follow this court's claim construction of the "coprocessor limitations" in rendering his infringement opinion; and (2) Alpert's infringement opinion fails to

aid the fact-finder because there is no basis for Alpert's premise that the 36 mobile devices he

analyzed are "representative" of all allegedly infringing mobile devices.[2] (Id.)

## 1. **Objection #1**

BB&T contends that Alpert contradicts this court's claim construction by opining

that the ARM system-on-chips includes two processor structures, i.e., integer and NEON, which

meet the coprocessor claim limitations. (ECF No. 1018 at 6-11.) At oral argument, BB&T

contended that this court's claim construction did not allow for Maxim to contend that "a subset

of the same main processor" could qualify as a coprocessor. (Trans. at 11, 15.) Maxim argued in

response that Alpert's opinion is in conformance with this court's claim construction. (ECF No.

1034 at 7-13; Trans. at 11-12.)

The court construed the disputed claim term "coprocessor" as "a processor that

works with another processor." (ECF No. 742 at 18-19.) In doing so, the court rejected the

notion that coprocessors must be distinct from and run concurrently with another processor, and

explicitly stated that, if necessary, the jury should be instructed that the circuitry of the math

coprocessor, the modular exponentiation accelerator circuit, and the coprocessor circuit need not

be structurally distinct from any other processor. (Id. at 18 & n.5.)

It is well-settled that an expert can offer an opinion on how a court's claim

construction should be applied to the facts of a case, but cannot offer an opinion that contradicts

or disregards a court's claim construction rulings. Personalized User Model LLC v. Google, Inc.,

No. 09-525, 2014 WL 807736, at *1 (D. Del. Feb. 27, 2014); CMU v. Marvell Tech. Grp., Ltd.,

No. 09-290, 2012 WL 5451495, at *1-2 (W.D. Pa. Nov. 7, 2012). At the Daubert hearing, this

---

[2] Although BB&T argued in its written submission that Alpert's sweeping and unsubstantiated opinions were unduly prejudicial to BB&T, and, therefore, inadmissible under Federal Rule of Evidence 403, following the court's rejection of BB&T's first two objections at the Daubert hearing, BB&T abandoned this final objection. (Trans. at 26.)

court ruled that Alpert's opinion did not contradict the court's claim construction opinion. (Trans. at 6.) The court explained that the dispute between expert witnesses with respect to whether the NEON structure and the integer structure qualify as coprocessors under this court's claim construction raised a jury question. (Trans. at 16.) The court overruled BB&T's objection on the record for these reasons.

## 2. **Objection #2**

BB&T objects to Alpert's opinion because it is based upon the faulty premise that the 36 mobile devices he analyzed are "representative" of all allegedly infringing devices on the market. (ECF No. 1018 at 12-14.) At oral argument, BB&T clarified that the fundamental flaw in Alpert's approach is that he concludes that particular hardware elements are present in a device by examining the software (i.e., the operating system) being used on a device, which is technically flawed. (Trans. at 19-22, 24-25.) In response, Maxim argued that Alpert adequately explained why he considered the 36 mobile devices that he tested to be representative and how he reached his opinions about the presence of hardware and software features by examining them. (ECF No. 1034 at 13-18; Trans. at 22-23.)

An expert's opinion must be supported by sufficient facts and data and cannot be based upon subjective belief or *ipse dixit* of the expert. Daubert, 509 U.S. at 590; Oddi, 234 F.3d at 156. An expert can opine based upon representative devices as long as there is some support for the expert's conclusion that the representative device contains common features of all other devices. TiVo, Inc. v. Echostar Communications Corp., 516 F.3d 1290, 1308 (Fed. Cir. 2008).

At the <u>Daubert</u> hearing, this court ruled that Alpert's expert report satisfied the requirements of <u>TiVo</u> by explaining the reasons why he determined that certain devices were representative and why his examination of those representative devices supported his opinions. (Trans. at 18-19, 26.) The court further explained that BB&T's challenges went to the weight of Alpert's testimony on these matters, not to its admissibility, and were properly addressed to a jury, not to the court. (<u>Id.</u>) The court overruled BB&T's objection on the record for these reasons.

**B. <u>Challenges to the Damages Experts</u>**

**1. <u>Introduction</u>**

Both BB&T and Maxim objected to the other party's expert witness on damages. Not surprisingly, while Maxim's expert, Stephen Dell ("Dell"), opined that Maxim is entitled to millions of dollars in damages, BB&T's rebuttal expert, Dana Smith ("Smith"), opined that Maxim's damages would barely exceed six-figures. The court ruled at the <u>Daubert</u> hearing that the opinion of Smith was proper rebuttal, but reserved ruling on the admissibility of Dell's opinion. For the reasons explained below, the court concludes that Dell's opinion is admissible. This court, however, overrules BB&T's Rule 403 objection to Dell's testimony about BB&T's financial circumstances without prejudice so that the trial court can determine at which point the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, needlessly presenting cumulative evidence, or other such concerns. FED. R. EVID. 403.

## 2. **Legal Authorities**

Upon a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009); Georgia–Pacific Corp. v. U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).[3] In this case, the parties agree that the hypothetical negotiation would have taken place in January 2010.

Estimating a "reasonable royalty" is not an exact science and the record may support a range of possible reasonable royalties, rather than a single value. Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1314 (Fed. Cir. 2014), overruled on other grounds by Williamson v. Citrix Online, LLC, No. 2013-1130, 2015 WL 3687459 (Fed. Cir. June 16, 2015). There may also be more than one reliable method for estimating a reasonable royalty, including, for instance, relying upon the royalty rate from sufficiently comparable licenses, valuing the

---

[3] In assessing what the result of that hypothetical negotiation would have been, courts commonly consider the fifteen Georgia–Pacific factors, which are: (1) established royalty rate for the patent; (2) license rates paid for comparable patents; (3) type of license (exclusive/non-exclusive or restricted/non-restricted); (4) licensor's established licensing policies; (5) competitive relationship between licensor and licensee; (6) convoyed sales; (7) duration and terms of the license; (8) commercial success and established profitability; (9) advantages over old methods; (10) nature of patented invention and benefits to those that use it; (11) extent of use of the patent by the infringer; (12) customary industry rate for invention or analogous inventions; (13) portion of profit that should be credited to the invention as distinguished from nonpatented elements, manufacturing process, business risks, or significant features added by the infringer; (14) opinion testimony of qualified experts; and (15) amount that licensor and licensee would have agreed upon. Georgia–Pacific, 318 F.Supp. at 1120; see Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011).

infringed features based upon comparable features in the marketplace, or estimating the value of the benefit provided by the infringed features by comparing the accused product to noninfringing alternatives. Id.

Any licenses relied upon to prove damages must be sufficiently comparable, with respect to technology, economic terms, and time period, to the hypothetical negotiation at issue to support a reasonable royalty analysis. Lucent, 580 F.3d at 1325; Apple, 757 F.3d at 1325. It is the asserting expert's duty to demonstrate comparability. CMU v. Marvell Tech. Grp., No. 09-290, 2012 WL 3686748, at *4 (W.D. Pa. Aug. 24, 2012) (citing district court decisions). Once the expert shows some "discernible link between the comparable license and the claimed technology," distinctions and oversights are matters for cross-examination. CMU, 2012 WL 3686748, at *4 (citing ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870 (Fed. Cir. 2010)); Apple, 757 F.3d at 1326 (a jury is capable of assigning the appropriate weight to comparable licenses).

Comparable licenses are a reliable method of estimating a reasonable royalty because they inherently account for market conditions, such as the cost of noninfringing alternatives. Apple, 757 F.3d at 1326. Settlement agreements are typically not reliable to establish a reasonable royalty due to their inherent coerciveness, but if the agreements are proven to be reflective of the economic demand for the patented technology, then they can be relied upon. LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 77-78 (Fed. Cir. 2012); ResQNet.com, 594 F.3d at 870-72.

No matter whether the reasonable royalty is estimated to be a lump sum payment, or a running payment that varies with the number of infringing units, a patentee must take care to seek only those damages attributable to the infringing features. VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1326 (Fed. Cir. 2014). The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its patented technology. Id. at 1329. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product and no more. Id. at 1326.

When patent claims are drawn to an individual component of a multi-component product, it is the exception, not the rule, that damages may be based upon the entire value of that multi-component product. LaserDynamics, 694 F.3d at 67-68. Indeed, the Court of Appeals for the Federal Circuit has reaffirmed that "[a] patentee may assess damages based on the entire market value of the accused product *only where* the patented feature creates the basis for customer demand or substantially creates the value of the component parts." Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1268 (Fed. Cir. 2013) (emphasis added). In the absence of that kind of showing, principles of apportionment apply. VirnetX, 767 F.3d at 1326.

### 3. Challenges to the Expert Opinion of Stephen Dell

Maxim proffered Dell as an expert witness on the issue of damages. (ECF Nos. 1019-1 and -2.) Dell opines that Maxim's damages should be calculated as a running royalty using a flat rate fee per active user of the BB&T app, per year of infringement. (ECF No. 1019 at 5-6.) This method results in significant damages for each year of alleged infringement, and is ongoing. Dell offers an alternative opinion that the amount of damages should be a one-time, lump sum payment. (Id. at 18.) This method results in damages that exceed those that would be payable to date under Dell's running royalty calculation. BB&T challenged Dell's opinion on

five grounds: (1) it fails to apportion for nonpatented or conventional elements; (2) it relies upon

licenses that are not comparable because they include patents not at issue in this case, and are

based upon a lump sum payment, not a running royalty rate; (3) it improperly treats all asserted

patents as equal, by opining that the same royalty would be paid regardless of which, or how

many, Maxim patents are being licensed; (4) the alternative "lump sum" opinion is untimely, and

flawed for the same reasons; and (5) it is speculative and unduly prejudicial, to the extent it

includes testimony about the cost savings and revenue projections for "mobile banking." (ECF

No. 1019.)  Upon consideration of the entirety of Dell's report, and supplemental report, the

court concludes that Dell's opinion is admissible, and that the objections raised by BB&T are

appropriately raised by vigorous cross-examination.

### a.  Objection #1

BB&T's first objection is that Dell's opinion fails to apportion damages for

features that Maxim did not patent, conventional elements that Maxim did not invent, and

features already licensed to BB&T by Maxim through other licenses. (ECF No. 1019 at 9-15.)

According to BB&T, the discount that Dell deducts from the average flat rate fee per active user

reflected in the allegedly comparable licenses in order to account for BB&T's contribution to the

interface and technology is a failed attempt to apportion damages to the patented features of a

mobile device combined with the BB&T app. (Trans. at 31, 47-48.)  BB&T contends that any

proper damages opinion in this case must start with the value of the smallest saleable unit, which

BB&T claims is either the BB&T app or a mobile device with the BB&T app installed on it.

(Trans. at 35-36.)

It is beyond dispute that the law requires patentees to apportion a royalty down to a reasonable estimate of the value of its patented technology. <u>VirnetX</u>, 767 F.3d at 1329. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more. <u>Id.</u> at 1326. The entire market value rule is essentially an exception to that basic principle, which allows a patentee to assess damages based upon the entire value of an infringing product, but only if the patented feature creates the "basis for customer demand" or "substantially create[s] the value of the component parts." <u>Uniloc USA, Inc. v. Microsoft Corp.</u>, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

BB&T's first objection is not well-founded because it mischaracterizes Dell's opinion at its most fundamental level. Dell's damages opinion is not based upon the entire market value rule. (ECF No. 1019-2 at 18 n.46.) Dell does not calculate Maxim's damages as a fixed amount or percentage of the cost of a mobile device; e.g., $1.25 for every iPhone sold during the period of infringement with the BB&T app installed on it. Dell does not calculate Maxim's damages as a fixed amount or percentage of the value of mobile banking to BB&T; e.g. .01% of the millions of dollars in new revenue that BB&T attributed to its mobile banking activities. Dell does not calculate Maxim's damages as the cost to BB&T of having to abandon mobile banking entirely and return to in-branch only transactions. Dell's damages opinion is, instead, based upon an evaluation of the <u>Georgia-Pacific</u> factors, including a comparison of the licenses that Maxim entered into with third parties for the same technology with the circumstances surrounding BB&T's development and use of its mobile banking app.

Although the court will specifically address whether the licenses that Maxim entered into with the other entities are sufficiently comparable below in Section III.B.3(b), for purposes of the present discussion it suffices to note that most of these licenses were between Maxim and entities that were Opposing Parties in this MDL case before they agreed to settle their disputes with Maxim (the "OP Licenses"). (ECF No. 1019-1 ¶¶ 75-96, see ¶¶ 86-87, 89-95 (licenses deemed particularly "informative" by Dell).) The Opposing Parties were accused of infringing the same Maxim patents that BB&T is accused of infringing by offering mobile apps to their customers that are similar to the BB&T app. In the OP Licenses, the Opposing Parties agreed to pay Maxim for the technology that Maxim accused the Opposing Parties, including BB&T, of using without authorization in this MDL case. Dell refers to this as Maxim's "secure transaction" technology and patents.[4] (ECF No. 1019-1 ¶ 105.) The OP Licenses, therefore, inherently allocate value to Maxim's secure transaction technology when it is used, via an app, on a mobile device, and not to conventional or unpatented features of a mobile device or an app. Apple, 757 F.3d at 1326. The one license considered by Dell that Maxim entered into with a banking institution that was not named in this MDL proceeding involved the same patents asserted in this MDL case and is similar in other relevant respects to the OP Licenses, with the exception that it is not a settlement agreement (the "Non-OP Banking License").[5] (ECF No. 1019-1 ¶ 88, 96.) That license, therefore, likewise inherently apportions value to Maxim's patented technology. Dell need not apportion damages in the manner BB&T suggests because:

---

[4] Some of the OP Licenses also include related "mobile wallet" patents and technology, which distinction will be addressed in the next section when the court assesses the comparability of the licenses relied upon by Dell. See ECF No. 1019-1 ¶¶ 105, 166-70, 178; ECF No. 1019-2 ¶ 23.
[5] Dell also discusses a bundled license and a cross-license that Maxim entered into, but does not ascribe significant weight to these agreements based upon the fundamental distinctions between their terms and the hypothetical negotiation between BB&T and Maxim. (ECF No. 1019-1 ¶¶ 78-80, 85.) Those unique licenses need not be discussed further by this court for that reason.

(1) Dell does not apply the entire market value rule in reaching either damages opinion; and (2) the licenses that Dell considers to be comparable themselves apportion damages to the value of Maxim's technology.

BB&T's repetition of words such as "multi-component device" and "smallest saleable unit" cannot transform Dell's damages opinion into something that it is not. (Trans. at 36, 43.) Likewise, BB&T's reliance on decisions such as Ericsson, Inc. v. D-Link Systems, Inc., 773 F.3d 1201 (Fed. Cir. 2014), VirnetX Inc. v. Cisco Systems, Inc., 767 F.3d 1308 (Fed. Cir. 2014), LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 21 (Fed. Cir. 2012), and Wonderland Nurserygoods Co. v. Thorley Industries LLC, No. 13-cv-0387, 2015 WL 5021416 (W.D. Pa. Aug. 21, 2015), do not make entire market value rule principles applicable to Dell's opinion. (Trans. at 35-36, 40, 43-44; ECF No. 1040.) These decisions, in fact, demonstrate that the entire market value rule does not apply to Dell's opinion.

In Ericsson, the jury awarded damages of 15 cents per infringing product (i.e., laptops that included computer chips containing infringing Wi-Fi technology), based, in part, upon comparable licenses that "were themselves tied to the entire value of the licensed product, even though the technology being licensed related to only a component of those products." Ericsson, 773 F.3d at 1225. Because damages were assessed as a fixed value of a multi-component product (a laptop computer) and were based upon licenses that undisputedly included payments for nonpatented features, apportionment was essential in that case. In contrast, as explained above, Dell's opinion is not based upon the cost of a mobile device or even upon the value to BB&T of offering its customers mobile banking or the cost to BB&T of being unable to offer that service. Dell's opinion is based upon what he considers to be the average per active user flat rate fee that the other Opposing Parties agreed to pay Maxim for the same patented

technology that Maxim accuses BB&T of using without authorization in this case. As explained above, the OP Licenses apportion value to Maxim's technology under the circumstances of this case.

      VirnetX and LaserDynamics are in accord. In VirnetX the court of appeals determined that an expert witness' damages opinion was improper to the extent that it was based upon the full sales price of an iPhone instead of that portion of the sales price attributable to the infringing FaceTime feature. VirnetX, 767 F.3d at 1325-29. In LaserDynamics, an expert's opinion that the patent holder should be awarded 2% of the cost of all laptops sold with an infringing disc discrimination feature was deemed improper because there was no evidence that the feature drove demand for laptop computers, and there was no foundation for the 2% royalty rate. LaserDynamics, 694 F.3d at 69-70. Dell's damages opinion is not based upon the cost of any mobile device, either with or without the BB&T app installed on it.

      BB&T's citation to the recent decision in Wonderland Nurserygoods Co. v. Thorley Industries LLC, No. 13-cv-0387, 2015 WL 5021416 (W.D. Pa. Aug. 21, 2015), in support of its motion to exclude Dell's damages opinion is similarly without consequence. (ECF No. 1040.) In that case, Wonderland accused Thorley of selling a baby crib that included a fabric attachment feature that infringed its patent, as well as other features that admittedly did not infringe. Wonderland, 2015 WL 5021416, at *1. Wonderland proffered the opinion of an expert witness who determined the reasonable royalty by calculating the cost-impact on Thorley of disposing of its infringing inventory and developing and implementing a noninfringing baby crib. Id. at *16-17; Wonderland Nurserygoods Co. v. Thorley Industries LLC, No. 13-cv-0387, ECF No. 66 at 16-19; ECF No. 90 at 15-20. Wonderland claimed that the entire market value

rule did not apply because its expert did not use the full sales price of the infringing baby crib as a royalty base. <u>Wonderland</u>, 2015 WL 5021416, at *17.

The district court rejected Wonderland's narrow interpretation of the entire market value rule and excluded the opinion because even though the expert "did not discuss overall revenues" of Thorley's infringing baby crib, "his method nevertheless accounts for only the entire value of [the infringing baby crib] (and not merely the value of the patented [fabric attachment] feature)." <u>Id.</u> The damages opinion was inadmissible because it was based upon the entire cost impact on Thorley of disposing of and replacing the infringing baby cribs, even though Wonderland recognized that a) the innovation and market appeal of the infringing baby crib was not created by the infringing fabric attachment feature, and b) the infringing baby crib included features that did not infringe its patent. <u>Id.</u> <u>Wonderland</u> is readily distinguishable from the instant dispute about Dell's damages opinion for many reasons, including that the expert opinion in that case was not based, at all, upon comparable licenses, and Dell's opinion in this case is not based, at all, upon a cost-impact methodology. The rationale in <u>Wonderland</u> is not relevant to the admissibility of Dell's opinion.

Dell's damages opinion, like the OP Licenses and the Non-OP Banking License on which it relies, assigns a fixed monetary value to a customer's regular, yearly use of the BB&T app, which, when loaded onto a mobile device, allegedly practices Maxim's patented technology. Those licenses apportion value to the technology that Maxim owns because those licensees were paying Maxim to use the same technology that BB&T is accused of using without authorization in this patent infringement case. Dell does not contend that consumer demand for mobile devices is driven by the ability to load BB&T's app onto the device after purchase. Dell does not assess damages as a percentage of the purchase price of any mobile device. Dell does

not assess damages based upon the financial benefits to BB&T of the BB&T app. Dell does not assess damages by evaluating the cost impact upon BB&T of having to abandon the BB&T app, and replace it with another service. The fact that the app will be loaded onto a multi-component mobile device and that it is the combination of the device and the app that infringes Maxim's patents does not mean that Dell applied the entire market value rule in determining the amount of damages. (Trans. at 35-37.) Dell does not proffer an opinion that implicates the entire market value rule.

Dell's damages opinion is, instead, based upon an evaluation of the Georgia-Pacific factors, with special emphasis on an analysis of the OP Licenses and the Non-OP Banking License. As will be discussed below, any differences between those licenses and the hypothetical Maxim-BB&T negotiation are matters for cross-examination, not grounds for exclusion.

This objection to Dell's damages opinion is without merit and must be overruled.

### b. Objections #2 and #3

BB&T's second and third objections concern Dell's reliance upon allegedly comparable licenses. BB&T argues that Dell's damages analysis is fundamentally flawed because there are differences between the allegedly comparable licenses and the hypothetical negotiation between BB&T and Maxim. (ECF No. 1019 at 14-18.) BB&T specifically points out that the OP Licenses include additional patents, not at issue in this case; yet Dell improperly treats all asserted patents as equal, by opining that the same royalty would be paid regardless of which, or how many, Maxim patents were being licensed. (Id.) BB&T also points out that the comparable licenses are for lump sum payments, but Dell opines that a running royalty should be

paid in this case. (Id.) BB&T contends that the flat rate fee per active user that Dell uses in calculating the reasonable royalty is without foundation or explanation. (Id.)

As an initial matter, although the licenses upon which Dell relies are settlement agreements, this court concludes that they are not subject to exclusion on that basis. BB&T does not even contend that Dell cannot consider the OP Licenses because they are settlement agreements. (ECF No. 1019-1 (Dell Report); ECF No. 1022-1 (Smith Report).) Settlement agreements that are proven to reflect the economic demand for the patented technology can be relied upon. ResQNet.com, 594 F.3d at 870-72; LaserDynamics, 694 F.3d at 77-78. The court concludes, under the circumstances of this case, that the settlement agreements between Maxim and the other Opposing Parties are probative of the terms that would have been arrived at in a hypothetical negotiation between Maxim and BB&T in January 2010. Maxim executed those agreements with parties that it previously accused, along with BB&T, of infringing the same patents in this coordinated MDL case. BB&T, and the signatories to those licenses, jointly litigated this patent infringement case before the settlement agreements were signed. The fact that the OP Licenses are settlement agreements is not determinative in this case.

In order to rely upon other licenses to determine a reasonable royalty, an expert witness has the burden to prove that that they are sufficiently comparable to the hypothetical negotiation at issue. Lucent, 580 F.3d at 1325; Apple, 757 F.3d at 1325. Once the expert shows some "discernible link between the comparable license and the claimed technology," distinctions and oversights are matters for cross-examination. CMU, 2012 WL 3686748, at *4; Apple, 757 F.3d at 1326; ResQNet.com, 594 F.3d at 870.

Dell met his burden to establish that the OP Licenses and the Non-OP Banking License are sufficiently comparable, leaving questions about differences and distinctions for the jury to assess. Apple, 757 F.3d at 1326; CMU, 2012 WL 3686748, at *4. There is an obvious link between the other licenses and the hypothetical negotiation because the technology is the same, the same patents are licensed, and the alleged infringing acts are analogous. As the court referenced at the Daubert hearing, each of BB&T's arguments to the contrary are fodder for cross-examination. (Trans. at 55.)

Specifically, the objections made by BB&T about Dell's failure to account for the fact that some of the OP Licenses include additional patents for related, mobile wallet, technology and that the comparable licenses pay a lump sum, not a running royalty, are, in fact, addressed in Dell's report. Dell explains his reasons for concluding that the secure transaction technology, not the mobile wallet technology, is the actual source of value in the OP Licenses. (ECF No. 1019-1, e.g., ¶¶ 106, 166-70, 178; ECF No. 1019-2 ¶ 23.) Dell addresses why his opinion remains the same even though Maxim voluntarily dismissed its infringement claims under the '880 Patent. (ECF No. 1019-2 ¶¶ 17-19.) BB&T's disagreement with Dell's conclusions is a basis for cross-examination and contrary testimony, not exclusion. Dell likewise provides a basis for converting the lump sum payments reflected in the comparable licenses, which themselves account for multi-year infringements, into a running royalty damages opinion. (ECF No. 1019-1, e.g., ¶¶ 90-91, 93, 179); see ResQnet.com, 594 F.3d at 872 (finding opinion improper where expert failed to explain why a lump sum payment could be analogized to a running royalty). BB&T will be able to present its contrary opinion to the jury, but disagreement between experts is not a basis for exclusion.

Dell, therefore, can rely upon these other licenses as a basis for his expert opinion. The jury will be equipped, with the aid of the expert testimony of Dell and Smith, to assign the appropriate weight to the other licenses based upon any similarities, or differences, that each expert identifies. Apple, 757 F.3d at 1326; ResQNet.com, 594 F.3d at 870; CMU, 2012 WL 3686748, at *4. BB&T's disagreement with Dell's analysis and opinion must be borne out by the adversary process - competing expert testimony and active cross-examination - rather than be excluded. Mitchell, 365 F.3d at 244.

BB&T's final objection in this regard is that Dell's determinations of what average flat rate fee per active user is established by the comparable licenses, and what discount to apply to that average to account for the circumstances surrounding the hypothetical negotiation between BB&T and Maxim, are made without foundation or explanation. The court disagrees. Dell's opinion includes adequate explanation about the reasons he arrived at the average flat rate fee and the discount to apply to each active user in his version of the hypothetical BB&T-Maxim negotiation, providing BB&T with sufficient information to test and challenge his opinion at trial. (ECF No. 1019-1 ¶¶ 74-96, 176-81.) BB&T's objection is properly tested by cross-examination, and contrary evidence, not exclusion.

These objections to Dell's damages opinion are without merit and must be overruled.

### c. **Objection #4**

BB&T's fourth objection is that Dell's alternative lump sum royalty payment opinion is untimely, and flawed for the same reasons already discussed. (ECF No. 1019 at 18.) There is no dispute that Dell proffered his alternative opinion prior to his deposition in this case. (Trans. at 53-54.) No motion was filed to strike the opinion at the time it was proffered. The court, therefore, will not exclude this opinion on the ground that was untimely filed.

The alternative opinion is likewise not subject to exclusion based upon BB&T's disagreement with how Dell used the comparable licenses to calculate damages in this case. BB&T acknowledges that this argument is derivative of its challenges to Dell's running royalty opinion. (ECF No. 1019 at 18.) For the same reasons discussed above, therefore, this objection is without merit and must be overruled.

### d. **Objection #5**

BB&T's fifth objection is that Dell's opinion is speculative to the extent it includes testimony about the cost savings and revenue projections for "mobile banking." (ECF No. 1019 at 19.) According to BB&T, Dell's testimony about the substantial financial savings and benefits to BB&T of "mobile banking" will mislead, prejudice, and confuse the jury. (Trans. at 32-35.) As a general matter, Dell's discussion of the financial advantages of mobile banking informs his assessment of the <u>Georgia-Pacific</u> factors by describing the atmosphere in which the hypothetical negotiation would have taken place in January 2010. <u>See</u>, <u>e.g.</u>, ECF No. 1019-1 ¶ 161. The testimony is not the foundation of Dell's damages opinion, and BB&T's objection to the testimony because it is not "specific to BB&T or apportioned to the patented inventions" is not well-founded for this reason. Regardless, Dell's report includes information specific to BB&T, making BB&T's objection on this ground unavailing. (ECF No. 1019-1, e.g., ¶¶ 123-30,

155-61.)  With respect to the issue of apportionment, the court's discussion of that principle set forth above applies with equal force here.  Dell need not apportion the value of mobile banking to the features of Maxim's secure transaction technology because Dell does not opine that a jury should calculate a reasonable royalty based upon the "value of mobile banking" to BB&T.  This objection to Dell's damages opinion is without merit and must be overruled.

BB&T also argues, however, that this same testimony should be excluded pursuant to Federal Rule of Evidence 403 because the "inflated financial numbers" would unfairly prejudice a jury. (ECF No. 1019 at 19.)  This court cannot say that BB&T's argument lacks merit.  The trial court, however, is in the better position to assess the relevancy and prejudice of Dell's testimony in this regard.  Although some information about how important and valuable mobile banking was to BB&T in January 2010 is essential to recreate the environment in which BB&T would have willingly negotiated with Maxim for a license, at some point inundating the jury with financial data about BB&T's projected cost savings and revenue increases for mobile banking could become cumulative and unduly prejudicial.  This court is unable to make an assessment now about where that line should be drawn.  This objection to Dell's damages opinion is overruled, but without prejudice to BB&T's right to raise the issue during pretrial and trial proceedings, if necessary.

### 4. **Challenges to the Expert Opinions of Dana Smith**

BB&T proffered Smith as a rebuttal expert witness on the issue of damages.[6] Smith opines that Dell's opinion is flawed and the reasonable royalty agreed to by the parties in the hypothetical negotiation would have been a one-time payment of only a small fraction of the damages calculated by Dell. (ECF Nos. 1022-1 at 22; 1022-2.) Maxim seeks to exclude Smith's opinion because there is no reasoned basis for Smith's theory that the comparable licenses are based upon the value of "assets under management" instead of use, and Smith ignores contrary evidence. (ECF No. 1022 at 9-15; Trans. at 60-61.)

At the Daubert hearing, the court ruled that Smith's expert opinion was proper rebuttal to Dell's expert opinion. (Trans. at 56-57, 70-71.) Maxim's complaint that Smith provides no explanation for why she considered some licenses to be more probative than others is not supported by the record. (ECF No. 1022 at 9-15.) Her report includes a detailed analysis of each possibly comparable license, a critique of Dell's consideration of each license, and an assertion of a more appropriate conclusion based upon her review of those licenses. (ECF No. 1022-1 at 70-94.) Maxim's disagreement with her theory that the comparable licenses reflect a correlation between assets under management and the size of the license payment is a matter for cross-examination, not exclusion. The court found no basis to find that Smith "cherry-picked" from the comparable licenses, turned a blind eye to contrary evidence, or propounded a theory that was implausible on its face or amounted to no more than the *ipse dixit* of an expert witness, as Maxim contends. (Trans. at 57-62.)

---

[6] Richard J. Gering PhD was originally proffered as BB&T's expert witness, but Smith later adopted his report and became BB&T's testifying expert. Although the circumstances surrounding Smith's replacement involved inconsistencies on Gering's resume, Maxim does not challenge the admissibility of Smith's opinion on this basis.

The court overruled Maxim's objection to Smith's damages opinion on the record for these reasons.

**IV.  Conclusion**

For the foregoing reasons, Alpert, Dell, and Smith will be permitted to testify at trial.  BB&T's Rule 403 objection to Dell's reliance upon financial data and projections may be re-raised during pretrial proceedings or trial.  An appropriate order will be entered contemporaneously with this opinion.

Dated:  September 11, 2015                    BY THE COURT:

                                              /s/ *Joy Flowers Conti*
                                              Joy Flowers Conti
                                              Chief United States District Judge